**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **Carlos D. R.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:18-CV-0530-BH** |
| | § | |
| **NANCY A. BERRYHILL, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Consent** |

## MEMORANDUM OPINION AND ORDER

By consent of the parties and the order of transfer dated May 21, 2018 (doc. 17), this case

has been transferred for the conduct of all further proceedings and the entry of judgment.  Based on

the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

## I.  BACKGROUND

Carlos D. R. (Plaintiff) seeks judicial review of a final decision by the Acting Commissioner

of Social Security (Commissioner) denying his claim for disability insurance benefits (DIB) under

Title II of the Social Security Act (Act).  (*See* docs. 1; 18.)

### A.    Procedural History

On November 20, 2014, Plaintiff filed his application for DIB, alleging disability beginning

on July 25, 2011.  (doc. 14-1 at 79.)[1]  His claim was denied initially on March 24, 2015, and upon

reconsideration on July 13, 2015.  (*Id*. at 96, 102.)  On September 11, 2015, Plaintiff requested a

hearing before an Administrative Law Judge (ALJ).  (*Id*. at 106.)  He appeared and testified at a

---

[1] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

hearing on October 19, 2016.  (*Id.* at 40-68.)  On February 24, 2017, the ALJ issued a decision finding Plaintiff not disabled and denying his claim for benefits.  (*Id.* at 27-36.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on April 18, 2017.  (*Id.* at 155-56.)  The Appeals Council denied his request for review on January 11, 2017, making the ALJ's decision the final decision of the Commissioner.  (*Id.* at 4.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

## B.    <u>Factual History</u>

### 1.    **Age, Education, and Work Experience**

Plaintiff was born on March 10, 1980, and was 36 years old at the time of the hearing.  (*Id.* at 35, 45.)  He had at least a  high school education and was able to communicate in English.  (*Id.* at 35.)  He had past relevant work experience as an order clerk, shipping and receiving clerk, displayer/merchandise, and group leader.  (*Id.* at 34.)

### 2.    **Medical Evidence**

On June 13, 2011, Plaintiff underwent a TPE Evaluation at Dallas Spinal Rehabilitation Center, Inc. (Dallas Spinal).  (*Id.* at 312.)  He had sustained a work-related injury on March 15, 2011 when he was moving a cast iron bathtub into a showroom and developed back pain that day.  (*Id.*)  At a medical evaluation shortly after the injury, X-rays showed no fractures, and he was diagnosed with a thoracic lumbar sprain/strain and prescribed medication, including a Medrol dose pack, Flexeril, and Ultram, as well as 8 physical therapy sessions.  (*Id.*)  Plaintiff reported that his worst pain was in the middle of his back between his shoulder blades and the thorcolumbar junction.  (*Id.*)  A physical examination revealed that he was in mild to moderate distress due to pain.  (*Id.*)  His straight leg raise test was positive on the left; his motor exam showed "4+/5" in left knee extension

and dorsiflexion; and his musculoskeletal exam showed some spasms, trigger points, left S1 joint upslip within the pelvic ring, lumbosacral vertebral tenderness, and mild to moderate trigger points in multiple areas in the lumbosacral spine. (*Id*. at 313.) He was assessed with lumbar radiculopathy, myofascial pain syndrome, and a lumbar sprain/strain. (*Id*.) It was recommended that he undergo an MRI and noted that he could require epidural injections. (*Id*.)

Plaintiff also underwent a psychological diagnostic interview at Dallas Spinal on June 13, 2011. (*Id*. at 327.) He reported significant pain in his lower back to his left hip, a lot of pain in his mid back, and depending on the activity, pain on his left side all the way to his calf. (*Id*.) He reported feeling some depression and anxiety, frustration due to his inability to sleep and do things like he used to, worry about his condition, and fear of losing his job. (*Id*.) His testing was consistent with his self-reported feelings. (*Id*.) He did not report any treatment for anxiety, depression, or mental health problems. (*Id*. at 328.) He stated that it was hard for him to get to sleep because he could not get comfortable, and after he went to sleep, he would wake up because of his back pain when he tried to move. (*Id*. at 329.) His life had been affected by his back injury, and he was unable to do things he used to do. (*Id*.) Initial clinical impressions were good, and Plaintiff did not reflect any significant anxiety or depression during the evaluation. (*Id*. at 330.) He appeared to be uncomfortable though, and would shift in his chair while sitting and often needed to get up to walk around and move. (*Id*.) Diagnostic impressions included pain disorder associated with psychological factors and his general medical condition; chronic pain from his injury; chronic pain that caused significant disruption of activities of daily living and activities of work; and a Global Assessment of Functioning (GAF) score of 60. (*Id*.)

On June 26, 2011, Plaintiff underwent a functional abilities evaluation. (*Id*. at 338.) He

could occasionally sit, walk, bend/stoop, kneel, crawl, climb, reach above his shoulder, recline, and push/pull; and frequently stand, balance, and drive a vehicle. (*Id*. at 339.) He had deficits in squatting. (*Id*.) The range of motion in his lower back was not within functional normal limits on all planes, especially in flexion and extension. (*Id*.)

On July 15, 2011, Plaintiff had a follow-up at Dallas Spinal regarding his thoracic MRI. (*Id*. at 347.) He had a minimum left side disc bulge at T11-12, minimum neural foraminal narrowing with no obvious nerve encroachments, a small T11 inferior endplate Schmorl node without edema, mild loss of the kyphotic curve which could represent a muscle spasm, and no vertebral body fractures. (*Id*.) There was nothing that would obviously need surgical intervention. (*Id*.) It appeared that he had trigger points in his mid-thoracic paraspinal muscular trim and just lateral to it from pain and guarding, and he had pain in his costal sternal joints as well as some restriction of rib excursion at the lower ribs. (*Id*.) He was also having difficulty sleeping due to pain. (*Id*.) He was assessed with lumbar radiculopathy, myofascial pain syndrome, and a lumbar sprain/strain, prescribed Hydrocodone and Robaxin, and referred for a functional capacity evaluation. (*Id*.)

On September 7, 2011, Plaintiff was treated by Bryce Benbow, D.O., for back pain. (*Id*. at 302.) Plaintiff reported constant back pain since his injury in March that he rated as a 5 out of 10. (*Id*.) It increased with lifting, sitting, walking, or overhead reaching, and decreased with lying down or remaining still. (*Id*.) He had been terminated from his job, was not working, and was not taking any medications. (*Id*.) The majority of his pain was in his upper lumbar and lower or mid thoracic areas. (*Id*.) It was noted that he previously had a laminectomy surgery at L5-S1 on the right. (*Id*.) He had tenderness to palpation of the paraspinous region and the thoracic spine, as well as along the mid portion of the thoracic spine. (*Id*.) He also had some very mild paraspinous tenderness to

palpation of his lumbar spine. (*Id.*) He could forward flex to around 40 degrees with pain in the thoracic region, there was no pain with extension, and he had pain with side bending and rotation. (*Id.*) His straight leg raise test was negative. (*Id.*) An MRI of the thoracic spine showed some disc deterioration or disc desiccation at T11-12 with left sided foraminal narrowing secondary to disc herniation/bulge. (*Id.* at 303.) An MRI of the lumbar spine showed prior laminectomy defects at L5-S1 on the left and some slight disc desiccation, but no disc herniation. (*Id.*) He was diagnosed with myofascial pain in his thoracic spine and disc protrusion or disc displacement at T11-12. (*Id.*) Dr. Benbow recommended a thoracic epidural injection at T11-12, and Plaintiff received trigger point injections. (*Id.*)

On September 14, 2011 and October 26, 2011, Plaintiff saw Karen M. Perl, D.O., for follow-ups. (*Id.* at 351-54.) In September, he was distressed due to his spinal injury, but he ambulated without any assistive device. (*Id.* at 351.) He had some difficulty with rotation of the thoracic spine, his trigger points had tenderness to palpation, and his range of motion in the lumbar spine was painful with flexion. (*Id.*) His straight leg raise test was positive on the left, and he had a negative Patrick Faber's test bilaterally. (*Id.*) Deep tendon reflexes were +2/4 in the upper and lower extremities, and manual muscle testing was 4+/5 in the lower extremities. (*Id.*) In October, he was having a lot of difficulty with depression. (*Id.* at 353.) He walked with no shuffling, ataxia, or antalgia; continued to have issues with his range of motion in his thoracic spine along with radiating pain; had 30 degree flexion and 15 degree extension range motion in his lumbar spine along with flexion based pain; had a positive left straight leg raise test; had full range of motion in his hips and knees; and had deep tendon reflexes of +2/4 in the upper lower extremities and manual muscle testing of 4+/5 in the lower extremities bilaterally. (*Id.*) Dr. Perl's impressions included a T11-12

disc protrusion, L5-S1 protrusion with prior laminectomy deficits, and lumbar radiculitis affecting the lower extremities. (*Id*. at 352, 354.)

On November 3, 2011, Roger Beaudoing, M.D., completed a medical consultation and evaluation for Plaintiff. (*Id*. at 316-21.) Plaintiff was very depressed because he continued to have a great deal of pain, he had lost his job, and he was unable to pursue any gainful employment because of the intensity of the pain in his dorsal spine. (*Id*. at 316.) An examination of his cervical spine and upper extremities was within normal limits; the range of motion in his cervical spine was normal; the range of motion of his shoulders, elbows, wrists, and hands was normal; his hand grasp was normal; and muscle strength testing revealed no weakness of any of the flexors/extensors or abductors/adductors. (*Id*. at 318-19.) A neurological and musculoskeletal examination of Plaintiff's thoracolumbar spine revealed extreme tenderness to palpation of the thoracic spine and the interscapular region, and palpation of the spine caused reflectory spasms of the para-thoracolumbar muscles associated with a gross decrease in movements to the left or right. (*Id*. at 319.) Palpation in the interscapular region also revealed tenderness that could be related to the scapulothoracic bursae on both sides. (*Id*.) There was no evidence of any sensory deficit, but there was evidence of a total loss of function related to pain in that area. (*Id*.) He had endplate Schmorl's nodules without edema at T11 and a disc bulge at T11-12 with minimal neuroforaminal narrowing, but no evidence of nerve encroachment. (*Id*.) The range of motion in his dorsal spine appeared to be normal. (*Id*.) An examination of his lumbar spine and lower extremities revealed no scoliosis, lordosis, or thoracic kyphosis, his posture was normal, there was no evidence of any non-anatomical deep tenderness or superficial skin tenderness, the sacroiliac joints and sciatic notches were intact, and the examination of the lower extremities was completely normal. (*Id*.) Range of motion of the

lumbar spine was close to normal, and range of motion of the hips, knees, ankles, and toes was normal. (*Id.*) Plaintiff was able to heel and toe walk without difficulty, perform a squat without any limitations, and tandem walk. (*Id.* at 320.) Dr. Beaudoing diagnosed Plaintiff with intractable thoracolumbar pain related to Schmorl's node pathology, and disc bulging at T11-12 with left neuroforaminal narrowing. (*Id.*) He recommended that Plaintiff receive an epidural steroid injection in the thoracic spine in the T11 and T12 areas. (*Id.*)

Also on November 3, 2011, Plaintiff underwent a psychological diagnostic interview at Dallas Spinal. (*Id.* at 322.) He reported continued very significant pain in his lower back and left hip, as well as a lot of pain in his mid back. (*Id.*) He was feeling increasingly depressed and frightened, scared that he could not do things with his child, and worried about his finances. (*Id.*) He was unable to return to work on full duty and had lost his job. (*Id.*) He self-rated his depression at a 6-7 out of 10 and his anxiety at a 7-8 out of 10. (*Id.*) Testing was consistent with his self-reports. (*Id.* at 323.) Initial clinical impressions of Plaintiff were good, he was oriented times 4 with no indications of delusions or confusion, and he was able to discuss issues in an abstract and concrete manner. (*Id.* at 325.) He reflected depression during the evaluation, however, and also appeared uncomfortable and would shift in his chair and stand up or sit down. (*Id.*) His diagnostic impressions remained the same as from his prior psychological interview, but he had a GAF score of 59. (*Id.*)

From December 7, 2011 to August 24, 2016, Plaintiff met with Ranil Ninala, M.D., multiple times at Dallas Spinal. (355-78, 387-92, 445-50, 492-93, 507-40.) At his first appointment, he was frustrated and had lost his job, but was told that he was capable of starting another job that did not require heavy lifting activities, if he could find one. (*Id.* at 355.) At two appointments after he had

received epidural steroid injections, he reported that the injections "definitely helped" with the pain in the right side of his back, but at a later appointment following another injection, he reported no improvement and stated that it actually caused more harm. (*Id*. at 357, 369, 529.) Throughout his appointments he reported continued pain on both the right and left sides of his lower back and thoracic spine, as well as pain in his mid back. (*Id*. at 357, 359, 361, 363, 365, 367, 369, 371-72, 374, 381, 383, 385, 386, 389, 391, 445-48, 492, 507-40.) Back exams consistently showed no obvious swelling, ecchymosis, or deformity, and no tender spine or right paraspinals, but Plaintiff consistently had mild to moderate tenderness to palpation in his upper thoracic and mid lumbar paraspinals. (*Id*. at 385, 367, 369, 376, 385, 492, 533, 537.) Neurological exams were consistently grossly intact, and he also measured 5/5 in the bilateral extremities throughout, had symmetrical reflexes 1 to 2+ in the lower extremities, and showed intact sensation to light touch and no atrophy. (*See id*. at 355-78, 387-92, 445-50, 492-93, 507-40.) At all but two appointments, Plaintiff's gait was normal or essentially normal. (*Id*. at 355, 358-59, 361, 363, 365, 367, 369, 371-72, 374, 376, 381, 383, 385, 387, 389, 391, 445-48, 492, 507-40.) His lumbar range of motion testing also showed forward flexion of 30 degrees, extension of 15 degrees, and right and left lateral flexion of 20 degrees, but at a later appointment he had flexion of 50 degrees, extension of 15 degrees, and right and left lateral flexion of 25 degrees. (*Id*. at 357, 369, 533.) He was assessed with a thoracic sprain/strain and thoracic pain throughout his appointments, as well as chronic mid back pain at a few appointments, and disc bulges at T11-T12 with Schmorl's node at T11 at one appointment. (*Id*. at 356, 358, 360-61, 363, 365, 367, 369, 371-72, 374, 377, 381, 383, 386-87, 389, 391, 445-48, 492, 507-40.)

On April 11, 2012 and December 5, 2012, work status reports were completed for Plaintiff.

(*Id*. at 336-37.) He was found to have essentially no limitations with respect to sitting, standing or walking, but he had limitations in reaching, twisting, and climbing, and he was also limited to lifting and carrying no more than 15 pounds. (*Id*.)

On May 16, 2012, Plaintiff met with Dr. Benbow again for a follow-up regarding his back and leg symptoms. (*Id*. at 300.) Dr. Benbow noted that since his prior appointment, Plaintiff had received 2 thoracic epidural injections which gave him significant relief that was greater than 60% for 2 or 3 weeks before his pain level increased, and he also had 9 sessions of physical therapy in combination with the injections. (*Id*.) His pain was still severe in nature, and he reported that it was a 6 out of 10 on a regular basis. (*Id*.) Lifting, sitting, walking, overhead reaching, and unlevel surfaces increased his pain significantly. (*Id*.) He had some lower back pain and buttock pain, but his most severe pain was in his thoracic spine area. (*Id*.) Upon physical examination, Plaintiff had a normal heel-strike and toe-off gait pattern, and he could heel and toe walk without difficulty. (*Id*.) He had severe tenderness to palpation in his lower thoracic region and pain in his paraspinous region. (*Id*.) There was pain with range of motion testing with forward flexion of 30-40 and side bending rotation, but his indirect straight leg raise test was negative bilaterally, and his supine straight leg raise test was negative as well. (*Id*.) He also measured 5/5 in hip flexion, leg extension, leg flexion, tibialis anterior, extensor hallucis longus, and gastroc-soleus muscle testing bilaterally. (*Id*.) He was diagnosed with a thoracic sprain/strain, myofascial pain in his thoracic spine, and disc protrusion and disc displacement at T11-12 with thoracic radiculitis. (*Id*.) Dr. Benbow noted that all conservative treatment had failed, but his brief response to the injections was a good indicator that he would do well with surgery. (*Id*.)

On July 18, 2012, Plaintiff returned to see Dr. Benbow for a follow-up regarding his thoracic

pain, which had been ongoing and severe in nature. (*Id*. at 298.) The improvement from prior epidural injections had completely worn off, and he reported increased pain and rated his symptoms as severe. (*Id*.) He had increased pain with sitting, walking, and overhead reaching. (*Id*.) The results of a physical examination were the same as his prior appointment with Dr. Benbow in May. (*Id*.) Dr. Benbow's impressions included thoracic sprain/strain, myofascial pain in the thoracic spine, disc protrusion and disc displacement at T11-12 with thoracic radiculitis, and costochondritis. (*Id*.) Dr. Benbow recommended that Plaintiff undergo a psychological evaluation and discussed the possibility of a future surgery. (*Id*.)

On August 13, 2012, Plaintiff underwent another psychological diagnostic interview at Dallas Spinal to determine if there were any significant psychological issues that needed to be considered in developing medical plans because he was being considered for a dorsal column stimulator or a dorsal thoracic fusion. (*Id*. at 332.) He reported pain in his mid back that went across to the left side of his back and down, as well as a lot of pain in the left side of his chest. (*Id*.) He knew he was depressed, frightened, and frustrated about his situation, and he believed that Dr. Benbow knew how to help him manage his pain. (*Id*.) He self-rated his depression at a 4-5 out of 10 and his anxiety at a 7-8 out of 10. (*Id*.) He also reported that it was difficult for him to get to sleep because he tossed and turned all night, and he did not feel rested. (*Id*. at 333.) Significant stressors in the prior year included chronic pain, significant disruption of activities of daily living, inability to work, and financial stress. (*Id*.) Initial clinical impressions were good, and Plaintiff did not reflect any significant anxiety or depression, but he did appear uncomfortable and had to shift in his chair and get up and sit down to try to get more comfortable. (*Id*. at 334.) His diagnostic impressions were the same as at his prior psychological interview in November 2011. (*Id*.) It was

determined that Plaintiff had no psychological issues that would interfere with his ability to be able to make good decisions and participate fully in determining the medical plan that he and his physicians would choose to consider. (*Id*. at 335.) Although he acknowledged some depression and anxiety, he appeared to be managing it adequately. (*Id*.)

On May 24, 2013, Plaintiff met with Naimah S. Harris, P.A., to have his back injury re-checked. (*Id*. at 296.) He felt that his symptoms were worsening, but he had been taking his medication and had noted improvement, although his back pain was still significant. (*Id*.) His pain was at a 9 out of 10, and he felt like it was moving around to his abdomen and ribs as well. (*Id*.) It was noted that he should not lift over 15 pounds, push/pull over 25 pounds, bend more than 2 times per hour, or do any prolonged standing/walking longer than tolerated. (*Id*. at 297.)

On May 29, 2013, Plaintiff again met with Dr. Benbow for a follow-up. (*Id*. at 294.) He continued to have severe pain in the mid back in the thoracic spine area that was probably at the T11-12 segment, and it was predominantly on the left and radiating on the left rib cage up to the sternum on occasion. (*Id*.) He occasionally had some pain into the upper abdominal area and spasm, and he continued to take Mobic and Hydrocodone. (*Id*.) He was not working and stated that his pain could be up to as high as a 9 or 10 at times. (*Id*.) His physical examination showed that he had normal heel-strike and toe-off gait pattern, could heel and toe walk without difficulty, had tenderness to palpation of his thoracic spine region predominantly on the left paraspinous region, had pain with range of motion testing, and could forward flex to 30 and extend to 5-10 degrees. (*Id*.) His straight leg raising test was also negative bilaterally. (*Id*.) He continued to measure 5/5 in hip flexion, leg extension, leg flexion, tibialis anterior, extensor hallucis longus, and gastroc-soleus muscle testing bilaterally. (*Id*.) Dr. Benbow's impressions included a thoracic sprain/strain, disc

herniation at T11-12 with thoracic radiculitis, myofascial pain in the thoracic spine, and costochondritis. (*Id*.) Dr. Benbow recommended that Plaintiff follow-up for a possible repeat epidural injection and possibly a series of botox injections to the paraspinous musculature. (*Id*.)

On March 12, 2014, Plaintiff was seen by Dr. Perl for a follow-up and refills on his medication. (*Id*. at 379.) He was in no acute distress and walked with no shuffling, ataxia, or antalgia. (*Id*.) He was also able to heel and toe walk bilaterally and ambulate independently. (*Id*.) He had decreased flexion and extension in his lumbar spine, a positive straight leg raise test, and a negative Faber's test bilaterally. (*Id*.) He was diagnosed with chronic lumbar radiculitis and a thoracic spinal cord injury with fusion. (*Id*. at 380.)

On March 12, 2015, Christopher G. Bellah, Ph.D., performed a psychological evaluation for Plaintiff due to his depression, anxiety, and concentration issues. (*Id*. at 424-28.) Upon arrival, his posture was predominately upright and his gait was ambulatory but labored. (*Id*. at 424.) He reported that his mental health issues began after he injured his back. (*Id*. at 425.) His constant preoccupation with pain was tiresome and resulted in persistently high levels of irritability and distress. (*Id*.) He expressed no signs of acute distress and described his condition as poorly managed with pain medications. (*Id*.) Dr. Bellah noted that Plaintiff had previously been diagnosed with a thoracic strain/sprain and chronic mid-back pain. (*Id*.) Plaintiff reported that his basic living skills were limited by his inability to bend or lift more than 15 pounds, his instrumental living skills were intact, he was able to perform routine activities of daily living in a timely and appropriate manner without assistance, and he had an adequate social support system. (*Id*.) He speculated that he would be unable to follow instructions, work at a reasonable pace, and work well with others in an occupational setting during to his debilitating back pain and poor coping skills. (*Id*. at 425-26.)

His mental examination was unremarkable, and Dr. Bellah diagnosed him with severe somatic symptom disorder with predominant pain. (*Id*. at 427-28.) His prognosis for improvement was guarded due to his lack of mental health treatment. (*Id*. at 428.)

On March 19, 2015, Roberta Herman, M.D., a state agency medical consultant (SAMC), completed a physical residual functional capacity (RFC) assessment for Plaintiff based on the medical evidence of record. (*Id*. at 74-76.) She opined that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pound frequently; stand and/or walk with normal breaks for about 6 hours in an 8-hour workday; sit with normal breaks for about 6 hours in an 8-hour workday; push and/or pull without limitations other than those shown for lift and carry; occasionally climb ramps, stairs, ladders, ropes, or scaffolds; occasionally stoop; frequently kneel, crouch, and crawl; and balance without limitation. (*Id*. at 75.) She further opined that Plaintiff did not have manipulative limitations, visual limitations, communicative limitations, or environmental limitations. (*Id*. at 75-76.) She concluded that Plaintiff's alleged limitations were partially supported by the medical evidence of record. (*Id*. at 76.)

On April 8, 2015, Plaintiff underwent another psychological diagnostic interview to help develop rehabilitation, pain management, and medical plans. (*Id*. at 489.) He remained very frightened about his future and overall situation but did not report any treatment for depression or anxiety. (*Id*.) His sleep remained very disrupted. (*Id*. at 490.) Initial clinical impressions were good, but he did appear to be uncomfortable and needed to move around. (*Id*. at 491.) He was diagnosed with pain disorder associated with psychological factors and his general medical condition; chronic pain from his injury; chronic pain that caused significant disruption of activities of daily living, inability to work, and financial stress; and a GAF score of 59. (*Id*.)

On April 29, 2015, thoracic spine radiographs showed unremarkable results aside from a superior endplate Schmorl's node at T8.  (*Id*. at 547.)

From April 29, 2015 to August 7, 2015, Plaintiff met with Dr. Benbow at the Minimally Invasive Spine Institute.  (*Id*. at 435-441.)  He reported back pain and leg pain, but most of the pain was in his thoracic spine, and it was more severe on the left than on the right.  (*Id*. at 435-36, 438, 440.)   He had also noticed changes in his balance, and lifting, walking, sitting, standing, and showering increased his pain.  (*Id*. at 440.)  Exams of his thoracic spine showed that he had 10 degree forward flexion and 5 degree back extension, but both caused pain, with flexion being more painful than extension.  (*Id*. at 435-36, 438, 440.)  He also had tenderness to palpation at the left T10 to T12 level that was worse on the left, and pain in the upper thoracic region of the T4 to T7 levels that was more severe on the left.  (*Id*.)  He consistently had straight leg raise tests that were positive on the left, but negative on the right.  (*Id*.)  Dr. Benbow's diagnosed him with disc displacement at T11-T12.  (*Id*. at 435-36, 439, 441.)

On June 24, 2015, Laurence Ligon, M.D., a SAMC, completed a physical RFC assessment for Plaintiff.  (*Id*. at 86-88.)  He opined that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pound frequently; stand and/or walk with normal breaks for about 6 hours in an 8-hour workday; sit with normal breaks for about 6 hours in an 8-hour workday; push and/or pull without limitations other than those shown for lift and carry; frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; occasionally stoop; frequently kneel, crouch, and crawl; and balance without limitation.  (*Id*. at 87.)  Plaintiff did not have manipulative limitations, visual limitations, communicative limitations, or environmental limitations.  (*Id*. at 87-88.)  He concluded that Plaintiff's allegations were partially credible based on the evidence of record, but the severity

of the alleged limitations were not fully supported. (*Id*. at 88.)

On July 21, 2015, Plaintiff underwent a psychological diagnostic interview to determine if he had any significant psychological issues that needed to be considered in developing medical plans. (*Id*. 484.) He reported that he struggled with some depression because he had been dealing with the pain from his injury for so long. (*Id*.) His testing was consistent with his self-report, and his depression score was in the moderate range. (*Id*.) He was not undergoing any treatment for anxiety, depression, or mental health problems, and he did not have a history of any such treatment. (*Id*. at 485.) He was not sleeping well, but medicine helped, and he would sleep a maximum of 2-3 hours without waking up. (*Id*.) At times he would have to get up and move to the recliner. (*Id*.) He did not reflect any dramatic anxiety or depression during the evaluation, but he did appear uncomfortable and needed to move around at times. (*Id*. at 487.) His diagnoses included pain disorder associated with psychological factors and his general medical condition; chronic pain from his injury; chronic pain that caused significant disruption of activities of daily living, inability to work, and financial stress; and a GAF score of 59. (*Id*.)

From September 8, 2015 to May 9, 2016, Plaintiff had follow-up appointments at Concentra for his thoracic spine injury. (*Id*. at 451-64.) He reported chronic pain, and reviews of his symptoms occasionally revealed joint pain, muscle pain, joint stiffness, back pain, muscle weakness, limping, leg weakness, tingling, and numbness. (*Id*. at 451, 460, 462.) In September, he had decreased range of motion to overhead reaching with his left shoulder due to his thoracic back pain. (*Id*. at 463.) He consistently had tenderness in his thoracic spine and left paraspinal that was rated at a 6 out of 10, hypersensitivity to palpation over his thoracic spine, and decreased range of motion in all planes with pain. (*Id*. at 452, 456, 460, 463.) In March, he was doing better, standing better,

being more active, and having pain that was a 4-5 out of 10. (*Id*. at 453.) He still had back pain and leg weakness, however, and his pain increased to a 9 out of 10 on his next appointment. (*Id*. at 453-54, 451.) His gait was consistently mildly antalgic, and he favored his left side. (*Id*. at 452, 456, 460, 463.) He was continuously assessed with a thoracic disc herniation and myofascial pain, as well as costochondritis at later appointments. (*Id*. at 452, 454, 457, 459, 462.) He was also consistently restricted to lifting up to 15 pounds occasionally, pushing/pulling 25 pounds occasionally, bending occasionally, and standing/walking frequently. (*Id*. at 452, 454-55, 458-59, 463-64.)

On September 30, 2016, Plaintiff returned to Concentra; he was doing about the same with the left side of his body as before, and he complained of pain in his left upper back. (*Id*. at 554.) A review of systems showed joint pain, muscle pain, back paint, and joint stiffness. (*Id*.) His physical exam showed decreased active range of motion flexion of 70 degrees with pain, point tenderness to palpation in his left paraspinal muscles in his thoracic spine, and decreased active range of motion flexion of 70 degrees with pain and no tenderness to palpation in his lumbar spine. (*Id*. at 555.) His upper and lower extremity reflexes were symmetrical bilaterally, and sensation was intact to light touch. (*Id*.) He was assessed with thoracic disc herniation. (*Id*.) His restrictions remained the same as in his prior appointments at Concentra. (*Id*.)

### 3. Hearing Testimony

On October 19, 2016, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id*. at 40-68.) Plaintiff was represented by an attorney. (R. at 40, 42.)

#### a. *Plaintiff's Testimony*

Plaintiff testified that he was 36 years old, 5'6" tall, 162 pounds, and had 3 years of college

education.  (*Id*. at 45, 51.)  He lived with his wife and three children but was often not able to help with the children.  (*Id*. at 51-52.)  He would pick them up from school but sometimes had difficulty driving, depending on how he was feeling.  (*Id*. at 52.)  He bathed about every other day but had been slipping when he bathed lately, and he had fallen a few times within the prior year.  (*Id*.)

He previously worked as a group leader for summer camps for the Girl Scouts.  (*Id*. at 45-46.)  He took care of teenage students and only performed that job for 2 years during the summers.  (*Id*. at 46.)  He also worked as a shipping and receiving coordinator for a home fashions company, which required him to schedule containers and outbound trucks, as well as help to manually unload containers.  (*Id*. at 47-48.)  He lifted between 20-60 pounds depending on the situation, and he also did paperwork and answered phones, but he did not have any supervisory duties.  (*Id*. at 48.)  He then moved to a different company and worked as a shipping and receiving customer service clerk.  (*Id*. at 49.)  During that job, he took care of the showroom by installing new showpieces that came in and calling in purchase orders, and he also handled the shipping and receiving of goods.  (*Id*. at 49.)  The heaviest thing he lifted during that job was the bathtub that he was lifting on his own when he hurt his back.  (*Id*. at 49-50.)  He estimated that the bathtub weighed at least 250-300 pounds, but he did not typically have to lift that much weight during his job.  (*Id*. at 50.)

He went to Dallas Spinal monthly for his medications, which included Hydrocodone, Mobic, and Lyrica.  (*Id*. at 51.)  As a result of his injury, the Texas Mutual Insurance Company paid his doctor's bills, but he did not receive worker's compensation, and his worker's compensation claim had not yet been settled.  (*Id*. at 53-54.)  The pain from his back affected the left side of his body in both his legs and his arms, and his right side was affected as well, but nowhere near as much as his left side.  (*Id*. at 54.)  He could sit for about 10-15 minutes before he would have to get up and move,

and he could stand for about 30-40 minutes before either leaning on something or lying down. (*Id*.) He needed to stand up for at least 10-15 minutes before he could sit back down because he had a lot of back spasms when he would sit. (*Id*.) He rated his pain at the hearing at around a 9 out of 10, and his average pain during the week was about a 7 on a good day but usually at an 8-9. (*Id*. at 55.) He could walk about a quarter of a block before having to stop and rest. (*Id*. at 56.) He was left-handed, had problems lifting with his left side, and had weakness in his left hand. (*Id*.) He believed he could lift a bottle of apple juice from the fridge, but not if it was full. (*Id*.) He experienced tingling and some numbness in his right hand, but nothing near to how his left side felt. (*Id*. at 57.) He also experienced radiating pain on his left side and weakness in his left leg. (*Id*.) Temperature extremes did not really affect him, but his pain interfered with his concentration and focus. (*Id*.) Sometimes the pain would intrude on his thoughts and distract him, and it also made him angry. (*Id*.) He estimated that he could pay attention to a task for about 30 minutes before the pain interfered with him and made him have to stop what he was doing. (*Id*. at 58.) He was never really comfortable, but he had relief when he lay in bed reclining. (*Id*.)

His wife did the laundry in the house, and he rarely ever went shopping because he could not deal with people and walking. (*Id*.) His anger also affected his relationships with other people, including friends. (*Id*. at 58-59.) He had been experiencing a lot of depression and did not feel as though he had any quality of life due to his pain. (*Id*. at 59.) He did not think he could work because his pain would make it difficult, and he could not sit and focus or stay on task for very long, could not lift things or deal with people, could not walk for a long time, and could usually only eat once a day due to depression and medication side effects. (*Id*. at 59-60.) It was hard for him to walk and he knew his balance was off, which he felt caused him to fall in the bathtub. (*Id*. at 60.) At a

couple of doctor's appointments, his drug screen was negative for Hydrocodone, and he explained that he ran out prior to one appointment but could not remember why he was negative in the other one. (*Id.* at 61.) He also explained that while he was able to do push-ups at an appointment in March, it was shortly after he received a steroid injection, which had helped him a lot longer than it normally did. (*Id.*) He estimated that the benefit of that injection lasted about 2-3 weeks, which was the longest he ever had relief from an injection. (*Id.* at 61-62.) He was scheduled to undergo another injection in October, and discussed a possible nerve root blocker for treatment. (*Id.*) One doctor had also talked to him about surgery, which he would not mind having. (*Id.*)

### b. VE's testimony

The VE determined that Plaintiff's past work included jobs as an order clerk (sedentary, SVP 4), shipping and receiving clerk (medium, SVP 5), displayer/merchandise (medium, SVP 6),[2] and group leader (light, SVP 6). (*Id.* at 64.)

The VE considered a hypothetical individual with the same age, education, and work history as Plaintiff who could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and walk for 6 hours in an 8-hour workday; frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; occasionally stoop; and frequently balance, kneel, crouch, and crawl. (*Id.*) This individual would be able to perform Plaintiff's past work as an order clerk or group leader. (*Id.* at 64-65.)

Next, the VE considered a hypothetical individual with the same limitations, except this individual could stand and walk for 4 out of 8 hours; occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds.

---

[2] The VE noted that although the displayer/merchandise job was performed at the medium exertional level, it occasionally reached up to the very heavy range of physical demands. (doc. 14-1 at 64.)

(*Id*. at 65.)  This individual would also be able to perform Plaintiff's past work as an order clerk or group leader.  (*Id*.)

The VE then considered a hypothetical individual with the same limitations as in the second hypothetical, except this individual could understand, remember, and carry out only simple instructions; make simple work related decisions; attend and concentrate for extended periods; have no more than occasional interaction with the public; interact adequately with coworkers and supervisors; and respond appropriately to changes in a routine work setting.  (*Id*.)  This individual would not be able to perform any of Plaintiff's past work.  (*Id*. at 66.)  The individual could perform some jobs that were classified as light or sedentary by the Dictionary of Occupational Titles (DOT), including jobs as a small products assembler, DOT 706.684-022 (light, unskilled, SVP 2), with about 100,000 jobs in the national economy, 10 percent of which were located in the regional area; hand packager, DOT 559.687-074 (light, unskilled, SVP 2), with about 80,000 jobs nationally; and office helper, DOT 239.567-010 (light, unskilled, SVP 2), with about 80,000 jobs nationally.  (*Id*.)

The VE also considered a hypothetical individual with same limitations as the third hypothetical individual, except this individual could not attend and concentrate for extended periods because he would be off task at least 15 percent of the workday due to pain and the side effects of medications.  (*Id*. at 67.)  This individual would not be able to perform work because being off task 15 percent of the time would prevent him from maintaining employment.  (*Id*. at 67.)

C.    **ALJ's Findings**

The ALJ issued a decision denying benefits on February 14, 2017.  (*Id*. at 27-36.)  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date of July 25, 2011, through his date last insured of December 31, 2016.

(*Id*. at 29.)  At step two, the ALJ found that he had the following severe impairments: lumbar and thoracic degenerative disc disease; pain disorder associated with psychological factors and general medical conditions; and somatic symptom disorder with predominate pain, severe.  (*Id*.)  Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the social security regulations.  (*Id*.)

Next, the ALJ determined that Plaintiff retained the RFC to perform a reduced range of light work.  (*Id*. at 31.)  Specifically, he could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk 4 hours in an 8-hour workday; sit 6 hours in an 8-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; understand remember, and carry out simple instructions, make simple work-related decisions; and attend and concentrate for extended periods.  (*Id*.)  The ALJ further found that Plaintiff should have no more than occasional interaction with the public, but could interact adequately with co-workers and supervisors, and could respond appropriately to changes in a routine work setting.  (*Id*.)

At step four, the ALJ determined that Plaintiff was unable to perform his past work.  (*Id*. at 34.)  At step five, the ALJ found that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that Plaintiff was not disabled whether or not he had transferable job skills, but considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform.  (*Id*. at 32.)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Act, from July 25, 2011, the alleged onset date, through

December 31, 2016, the date last insured.  (*Id*. at 36.)

## II. LEGAL STANDARDS

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are also identical to those governing the determination under a claim for supplemental security income.  *See id*.  Courts may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision.  *See id*.

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638,

640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is

capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference

to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other

similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant

is not disabled at any point in the five-step review is conclusive and terminates the analysis.

*Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents two issues for review:

1.      Plaintiff's lumbar spine impairment meets the requirements of Listing 1.04A
of the Regulations, warranting remand.

2.      The ALJ's RFC finding is not supported by substantial evidence, warranting
remand.

(doc. 18 at 1.)

### A.      Listed Impairment

Plaintiff argues that the ALJ erred by failing to evaluate whether his spinal impairments met

Listing 1.04A. (*Id*. at 3-6.)

If a claimant is not working and is found to have a severe impairment at step two that meets

the duration requirement, the ALJ must determine at step three whether the claimant's impairment

meets or medically equals one of the impairments listed in the regulations.[3] *Compton v. Astrue*, No.

3:09-CV-051513-B-BH, 2009 WL 4884153, at *6 (N.D. Tex. Dec. 16, 2009) (citing 20 C.F.R. §

404.1520). If the claimant's impairment meets or medically equals a listed impairment, the

disability inquiry ends, and the claimant is entitled to benefits. 20 C.F.R. § 404.1520(d). The

claimant has the burden of proving that his impairment or a combination of impairments meets or

---

[3] These impairments are listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

medically equals one of the listings. *Id.*; *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990) (per curiam).

To meet a listed impairment, the claimant's medical findings, i.e., symptoms, signs, and laboratory findings, must match all those described in the listing for that impairment. 20 C.F.R. §§ 404.1525(d), 404.1528; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). To equal a listing, the claimant's unlisted impairment must be "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). The claimant shows that his unlisted impairment or a combination of impairments is "equivalent" to a listed impairment by presenting medical findings equal in severity to all the criteria for the most analogous listed impairment. *Sullivan*, 493 U.S. at 529–31; *see also* 20 C.F.R. § 404.1526(b)(2). The ALJ must consider all of the evidence that is relevant to the claimant's impairments and their effects, but must not consider vocational factors such as age, education, and work experience. 20 C.F.R. § 416.926(c). "[T]he responsibility for deciding medical equivalence rests with the [ALJ]." *Id.* § 416.926(e).

### 1.    Listing 1.04A

Listing 1.04A provides for presumptive disability for spinal disorders, stating that a claimant will be found disabled if he has:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthrosis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> > A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); . . .

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.04A. "These physical findings must be determined on the

basis of objective observation during the examination and not simply a report of the individual's allegation . . . ." *Id.* § 1.00D. "Observations of the individual during the examination should be reported[,] e.g., how he gets on and off the examination table." *Id.* § 1.00E. "Inability to walk on the heels or toes, to squat, or to arise from a squatting position . . . may be considered evidence of significant motor loss." *Id.*

Here, the ALJ found that Plaintiff had the following severe impairments: lumbar and thoracic degenerative disc disease; pain disorder associated with psychological factors and general medical conditions; and somatic symptom disorder with predominate pain, severe. (doc. 14-1 at 29.) Despite those impairments, the ALJ determined that Plaintiff's impairments did not meet or "equal the required criteria in Section 1.00, *Musculoskeletal System*, Section 12.00, *Mental Disorders*, or any other listed impairment." (*Id.*) The ALJ did not consider whether Plaintiff's spinal disorder met or equaled listing 1.04A, and provided no explanation as to how she concluded that Plaintiff's symptoms did not meet that listing. (*See id.*) The Commissioner concedes that the ALJ failed to explain why Plaintiff's spinal impairment did not meet or equal Listing 1.04A, and only argues that the ALJ's error was harmless. (doc. 19 at 5-7.) Accordingly, the ALJ erred by failing to explain why Plaintiff's spinal impairment did not meet the requirements of Listing 1.04A. *See Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (finding that the ALJ's failure to identify listed impairments or to "provide any explanation as to how she reached the conclusion that [the plaintiff's] symptoms [were] insufficiently severe to meet any listed impairment" prevented a meaningful judicial review); *Lopez v. Colvin*, No. 3:14-CV-00571-BH, 2015 WL 1473677, at *8 (N.D. Tex. Mar. 31, 2015) (finding error where the ALJ failed to explain how he determined that Plaintiff's symptoms did not meet the criteria of Listing 1.04 or point to any supporting medical

evidence).

## 2. Harmless Error

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party have been affected." *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989) (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988)) (per curiam). "[P]rocedural improprieties . . . will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Alexander v. Astrue*, 412 F. App'x 719, 722 (5th Cir. 2011) (emphasis added); *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). The ALJ's error is harmless if the substantial rights of a party have not been affected. *See Alexander*, 412 F. App'x at 722. Courts must therefore consider whether an ALJ's error in failing to discuss why he or she finds a claimant does not meet a Listing at step three was harmless. *See Audler*, 501 F.3d at 448 (citing *Morris*, 864 F.2d at 334) (applying harmless error analysis when the court ruled that the ALJ's failure to set out the bases for her decision at step three was erroneous).

Here, there is no evidence of nerve root compression in the record; rather, on July 15, 2011 and November 3, 2011, it was specifically noted that there was no evidence of nerve root encroachment. (doc. 14-1 at 319, 347.) Plaintiff's muscle strength consistently measured 4/5 or 5/5 in his bilateral extremities throughout, no atrophy was noted, he consistently had grossly intact neurological exams, and his gait was essentially normal throughout his treatments; although he did favor his left side at times. (*See id*. at 298, 300, 312, 351, 353, 355-78, 387-92, 445-50, 452, 456, 460, 463, 492-93, 507-40.) Many of his physical examinations also showed that he had normal heel-strike and toe off gait patterns, and that he could heel and toe walk without difficulty. (*Id*. at 294,

298, 300, 320, 379.)  Additionally, although his straight leg raise tests were positive on the left at

times, straight leg tests also revealed negative results bilaterally.  (*Id*. at 294, 298, 300, 302, 312,

351, 353, 379, 435-36, 438, 440.)  Notably, the majority of the treatment notes for straight leg raise

tests do not "state whether the test[s] [were] performed in both the sitting and supine positions," and

Plaintiff's supine straight leg raise tests were negative when measured.  *See Bayham v. United States

Comm'r Soc. Sec. Admin.*, No. 16-688-EWDA, 2018 WL 523208, at *9 (M.D. La. Jan. 23, 2018)

(citations omitted) (collecting cases in recognizing that courts in the Fifth Circuit "have consistently

held that Listing 1.04 requires positive straight leg raise tests in both the sitting and supine

positions.").  This evidence does not support a finding that the requirements of Listing 1.04A have

been met.

Because Plaintiff has failed to meet his burden to establish that he meets Listing 1.04A, he

cannot demonstrate that his substantial rights have been affected.  *Morin v. Berryhill*, No. A-17-CV-

787-AWA, 2018 WL 4559000, at *4 (W.D. Tex. Sept. 21, 2018) (finding that the plaintiff failed to

meet her burden where she "satisfied some but not all of the specific requirements of the listing for

disorders of the spine"); *Morris v. Astrue*, No. 4:07-CV-547-A, 2008 WL 4791663, at *2 (N.D. Tex.

Oct. 24, 2008) (determining that the plaintiff's substantial rights were not affected where she did not

meet her burden to establish that she met or equaled the requirements of Listing 1.04A).

Accordingly, the ALJ's error was harmless, and remand is not warranted on this basis.  *See Audler*,

501 F.3d at 447–49 (applying harmless error analysis to step three error); *Lopez*, 2015 WL 1473677,

at *9 (concluding that remand was not required where error at step three was harmless).[4]

---

[4] Plaintiff also argues that the ALJ should have submitted the complete record to a medical expert or sent him
for a consultative examination to more fully develop the record in making his determination at step three.  (doc. 18 at
6.)  Notably, he does not specifically raise an issue regarding the ALJ's duty to develop the record.  (*See id*.)  Even if
raised, however, the result because there is no indication that the medical records before the ALJ were inadequate, or

**B.**     **RFC Determination**

Plaintiff also argues that the ALJ's RFC finding is not supported by substantial evidence because she failed to consider all of the evidence of record. (doc. 18 at 6-9.) Specifically, he contends that "the ALJ failed to properly accommodate [his] limitations rendering him off task more than fifteen percent of the workday due to pain and medication side effects . . . ." (*Id*. at 7.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386–87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996

---

that she lacked sufficient facts to make a determination in this case. *Freeman v. Berryhill*, No. 3:15-CV-3640-N-BH, 2017 WL 1048127, at *7 (N.D. Tex. Feb. 13, 2017). Moreover, Plaintiff fails to show how this action by the ALJ would have led to a more favorable decision. *Id*.

WL 374184, at *1.  The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision, or all the evidence that she rejected.  *Falco v. Shalala*, 27 F.3d 160, 163–64 (5th Cir. 1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record.  *Leggett*, 67 F.3d at 564.  Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings."  *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).  The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision.  *Id*.  Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, after making a credibility finding regarding his alleged symptoms and limitations, and reviewing the evidence of record, the ALJ found that Plaintiff had the RFC to perform a reduced range of light work with the following limitations: he could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk 4 hours in an 8-hour workday; sit 6 hours in an 8-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; understand remember, and carry out simple instructions, make simple work-related decisions; attend and concentrate for extended periods; occasionally interact with the public; interact adequately with co-workers and supervisors; and respond appropriately to changes in a routine work setting.  (doc. 14-1 at 31.)

Plaintiff first relies on his own testimony that he could not work because he could not stay

on task, he was in pain, and he suffered side effects from his medication. (doc. 18 at 7-9.) According to his testimony, however, he only said he ate about once per day due to side effects from the medication, which gave him "the shakes" and made him nauseous. (doc. 14-1 at 59.) As for pain, the ALJ specifically considered the evidence of record, including his testimony and appearance at the hearing, and determined that although his "medically determinable impairments could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence[,] and limiting effects of [those] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . . ." (*Id*. at 34.) In determining that Plaintiff's subjective complaints were not entirely credible, the ALJ noted that although Plaintiff "moaned and moved about during the entire hearing, interestingly he ceased to do so when he was testifying about his work history, and when listening to the [VE] testimony." (*Id*.) She also noted that "[h]is overall behavior was extreme" because the medical evidence essentially showed "that over the course of his treatment he only exhibited tenderness and decreased range of motion in his[]thoracic area, without indication of more significant abnormalities," and more recent records showed that he was "generally doing well and feeling much better." (*Id*.)

Plaintiff also points to medical evidence in the record showing that he had tenderness, reduced range of motion, positive straight leg raising tests, and several diagnoses for issues with his back. (doc. 18 at 8.) He fails to identify any evidence in the record showing that his pain or medication side effects would cause him to be off task for more than 15 percent of the workday such as to preclude him from maintaining employment, however. (*See id*. at 8-9.) Additionally, the ALJ clearly considered the medical evidence in the record in determining Plaintiff's RFC. (*See* doc. 14-1 at 32-34.) She noted that treatment records showed only mild pain in the thoracic spinal area, mildly

positive straight leg raise tests, and that Plaintiff retained normal gait, full range of motion in his bilateral hips, intact foot sensation, and the ability to heel/toe walk without issue. (*Id*. at 32-33.) The ALJ also noted that although Plaintiff reported that he could not pursue gainful employment due to the intensity of his pain, examinations of his cervical spine and upper extremities were normal, his range of motion was normal, he could grasp normally with his hands, and his muscle testing did not reveal any weakness. (*Id*.) He also had normal sensation, and an examination of his lumbar spine and lower extremities was normal, as was his range of motion in his lumbar spine, hips, knees, ankles, and toes. (*Id*. at 33.) The ALJ did note that his symptoms could increase with lifting, reaching, and driving (*Id*. at 32.) The ALJ further discussed how Plaintiff's treatment was largely conservative, and that although treatment notes showed tenderness to the thoracic spine and paraspinals, Plaintiff retained normal gait. (*Id*. at 33-34.) The ALJ also noted Plaintiff's work status reports wherein he essentially had no limits with respect to sitting, standing, or walking, but was limited as to reaching, twisting, and climbing. (*Id*. at 34.) The ALJ then considered and gave some weight to the SAMC opinions which found that Plaintiff retained the ability to perform light work, with occasional to unlimited postural activities. (*Id*.) The ALJ ultimately found that over the course of his treatment, Plaintiff essentially only exhibited tenderness and decreased range of motion in the thoracic area, without indications of more significant abnormalities. (*Id*.)

Because the ALJ relied on medical evidence in the record and Plaintiff's own testimony in making the RFC determination, her assessment was supported by substantial evidence. *See Greenspan*, 38 F.3d at 236 (noting in applying the substantial evidence standard, a reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment). Accordingly, remand is not required on this basis.

### IV.    CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED**, on this 26th day of March, 2019.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE